Filed 5/29/13  P. v. Nelson CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061955 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD167943) |
| VERA NELSON, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kerry Wells, Judge.  Affirmed.

Laurel M. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, James D. Dutton and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

Vera Nelson appeals from an order extending her involuntary commitment as a mentally disordered offender (MDO) for another year.  She argues there is insufficient

evidence to support the MDO finding. She also contends the court erroneously excluded evidence on the option of outpatient treatment, and applied the wrong standard to decide the outpatient issue. We reject these contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Nelson suffers from schizophrenia, paranoid type; alcohol and cocaine dependence; and mild mental retardation.[1] Her MDO commitment offense occurred in June 2002 when she was living at a board and care facility. Nelson, who had been drinking heavily, got into an argument with another female resident. Nelson threw the woman across the room, punched her in the head and chest, and repeatedly kicked her in the head, saying, " 'Get up, bitch.' " Later, Nelson told the police that she was very angry at the way she had been treated at the board and care home; she took her anger out on the victim; she had a lot to drink; and she repeatedly kicked the victim because the victim would not get up. The victim died four days later.

In 2004 Nelson pled guilty to voluntary manslaughter, and in March 2005 she was committed to Patton State Hospital (Patton) as an MDO. (*People v. Nelson* (2012) 209 Cal.App.4th 698, 703.) From 2008 through 2011, her involuntary commitment was extended for one-year periods. (*Ibid.*) In the current case, the district attorney filed a recommitment petition on November 29, 2011. After a bench trial on May 10, 2012, the court extended her commitment for another year, until March 19, 2013.

---

[1]     Nelson reads at about second grade level.

The People's expert witnesses (psychologist Valerie Rice and psychiatrist Matthew Carroll) reviewed Nelson's police and medical records, and personally interviewed her in February 2012. Based on information acquired from these sources, at trial they described her past and current condition and behavior and provided their opinions concerning her MDO status.

Nelson's schizophrenia emerged in the 1980's or before, and prior to the 2002 commitment offense she had numerous inpatient psychiatric hospitalizations. Due to her schizophrenia, she experienced persecutory delusions, hallucinations, thought disorganization, and extreme impulse control problems. Her mental illness also caused her to be guarded and suspicious of others and socially isolated, and to have a "flat affect." Her persecutory delusions and illogical thinking likely contributed to the commitment crime and other incidents. When she was free in the community, she had a history of noncompliance with taking her medication, and had used cocaine and alcohol on a daily basis for many years.

In 2011 (the year prior to the May 2012 trial), Nelson was involved in several altercations with other patients and at times exhibited symptoms of her mental illness. On January 2, 2011, she complained to staff that her roommate's radio was too loud. A few minutes later, people were yelling for staff to intervene, and when staff arrived at Nelson's room she was choking her roommate. Nelson was escorted to another room, but she tried to leave and attack her roommate again. She ran into a bathroom and attempted to throw a trash can. Staff placed her in restraints to control her.

3

Even though Nelson was assigned a monitor to provide continual, one-on-one supervision, she nevertheless again erupted into violence on January 4, 2011. When she went to another patient's room to ask for something, a third patient yelled at her to get out of the room. Nelson grabbed this patient by both arms and pushed her to the floor. Nelson's supervising monitor intervened and escorted Nelson out of the room. About 10 minutes later, Nelson jumped up, ran past the monitor, and grabbed the patient by the hair. Staff intervened and escorted Nelson to a room. Nelson was agitated and was kicking, swinging, spitting on staff, and stating, " 'I'm going to kill all of you motherfuckers.' " Nelson was placed in restraints and given an intramuscular injection.

In an August 18, 2011 report, Patton staff gave Nelson a score of 40 on a "Global Assessment of Functioning" (GAF) evaluation, which is defined as involving some impairment, but which does not involve hallucinations, delusions, or dangerousness.[2] However, in this August report, Patton staff also reported that they had observed Nelson engage in behavior that suggested she was experiencing hallucinations or delusions, even though she denied that this was occurring. Nelson was seen having long conversations by herself, which could be a hallucinatory symptom of a conversation with unseen others.

---

[2] The 40 score is defined as "some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." A score of 30 is defined as behavior "considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas." A score of 20 is defined as "some danger of hurting self or others or occasionally fails to maintain minimal personal hygiene or gross impairment in communication." A score of 10 is defined as "persistent danger of severely hurting self or others or persistent inability to maintain . . . minimal personal hygiene or serious suicidal act with clear expectation of death."

She was also displaying a flat affect, and was often suspicious and distrustful of staff, avoided eye contact, and was socially isolative. Further, she exhibited disorganized behavior which impacted her ability to care for herself.[3]

In a September 2011 report, Patton staff stated that she fluctuated in her compliance with treatment and cooperation with staff; she intermittently refused medical appointments and medications; at times she committed rule violations and possessed contraband; and her group attendance and participation were inconsistent. During this September time period, Nelson told her treating psychiatrist that she was refusing her medication because she believed she was going to die from a tumor.[4] In an October 2011 report, staff stated she was largely compliant with her treatment, but she continued to refuse medication or other treatment on occasion. In a November 2011 report, she was reported as being generally compliant with staff and her treatment team.

In a December 16, 2011 report, Patton staff again reported a GAF score of 40 and stated that Nelson voluntarily took her medications. Dr. Rice agreed with the 40 GAF score. However, the December Patton report also referenced an altercation between Nelson and another patient that occurred on November 1 or 3, 2011, during which the patient called Nelson a "black bitch" and Nelson then grabbed the patient's shirt.

In January 2012, Nelson was transferred from Patton to the county jail pending the May 2012 trial on the recommitment petition. In January 5, 2012 discharge summary

---

[3]    The August 2011 report did not specify the exact dates when these various symptomatic behaviors were observed.

[4]    She did in fact have an inoperable tumor on her spleen.

reports from Patton, staff reported that Nelson was making "gradual progress" in her treatment; there was no current evidence of delusional thinking; and she had not engaged in "any assaults for a long time." Although she had been noncompliant with some of her medications for her physical conditions, she was compliant with her psychiatric medications. However, she still had "challenges with living with others."

Jail progress notes showed that while Nelson was housed at the jail from January 2012 until the May 2012 trial, she caused no problems and was compliant with her medications.

Based on their review of Nelson's medical records, the People's experts concluded that Nelson had generally been cooperative with taking her psychiatric medication. During the times when she was uncooperative, she would take the medications with prompting. Dr. Carroll testified that her occasional refusals to take her medication were a concern because of her potential for violence.

Dr. Rice assessed that since starting her involuntary treatment in 2005, Nelson had made some progress; i.e., she participated more in the various programs, was fairly compliant, and was cooperative most of the time. Dr. Carroll testified that her progress has been "up and down[,]" with periods of relative stability and other periods where she was doing poorly. The relatively recent January 2011 incidents showed she was becoming "very violent." However, over the last year her performance had been "a little better."

When interviewed by Drs. Rice and Carroll in February 2012, Nelson was cooperative, pleasant, and calm. She did not report any "positive symptoms" of

6

schizophrenia, such as hallucinations or delusions, and she did not engage in any overt behavior like screaming or yelling. However, she displayed some "negative symptoms" of schizophrenia, including "blunting" of emotions or flat or restricted affect, sparse responses to questions, confusion, and difficulty explaining herself. Although she denied hearing voices, Dr. Carroll testified that when he asked her a question she would sometimes just stare, which could indicate she was responding to internal stimuli (i.e., voices in her head).

Dr. Rice concluded that Nelson had limited insight into her mental illness. Although Nelson recognized that she has a diagnosis of schizophrenia, she was unable to understand how her illness played a role in her commitment offense and how it might make it difficult for her to adjust to living outside of a highly structured environment. Similarly, Dr. Carroll testified that although Nelson acknowledged that she needed treatment and medications, she did not appear to understand the seriousness of her behavior and the crucial importance of treatment.

When Dr. Rice asked about her commitment crime in June 2002, Nelson said her friend fell and hit her head on the coffee table while they were dancing; Nelson turned around to see if her friend was all right; she held her friend in her arms and wiped her head with towels because her head was bleeding; Nelson kept dancing; and if she had not been so drunk she would have gotten help for her friend. Dr. Carroll testified that Nelson provided a very vague description of the commitment offense, saying that she was drinking and got into a fight. When Dr. Carroll asked about her similar behavior in the hospital, she merely gave him a blank stare and did not want to talk about it.

7

Drs. Rice and Carroll acknowledged that in addition to her schizophrenia, Nelson's cognitive delays, long-term substance abuse, and other factors (including a brain injury) could contribute to her behaviors and symptoms. The doctors testified it was not possible to separate out her various mental conditions, but her paranoid schizophrenia was part of the cause of her symptoms and behavior. Further, some of her symptoms were very indicative of schizophrenia (including her bland affect), and some of her symptoms showed a condition that was not attributable merely to mild mental retardation (including disorganized speech, mood difficulties, repetitive speech, and social withdrawal).

Nelson told the doctors that if she was released into the community she would like to live with her sister in Kansas City and would be willing to see a psychiatrist. The doctors assessed that Nelson's plans were not realistic. Dr. Rice did not think Nelson would have adequate supervision and monitoring if she was in a less structured environment. In Dr. Carroll's view, she did not have a "good relapse prevention plan" but only vaguely stated that she would go to her sister's place and her sister would help her.

Although Nelson's alcohol and cocaine dependence were currently in "institutional remission," she did not have a plan to stay sober if released. When Dr. Carroll asked how she was going to stay away from drugs, she vaguely responded that she would "just stop" and not use them. Further, although she told Dr. Carroll that she used to have a problem with "crack" and get drunk a lot, when interviewed by Dr. Rice she "greatly minimized" her past substance abuse, stating she only used cocaine when she had money and she only drank alcohol "a little bit" at parties.

8

Drs. Rice and Carroll concluded that Nelson still met the MDO criteria because her severe mental disorder was not currently in remission and she was a danger to others as a result of her disorder. Nelson was still displaying such schizophrenic symptoms as flat affect, disorganized speech, confusion, being isolative and distrustful of others, and difficulties regulating her anger and mood. Concerning the danger caused by her severe mental disorder, the doctors noted that her commitment offense was a violent crime of beating a person to death, and she thereafter engaged in violence even though she was in a highly structured and monitored hospital environment. Further, the People's experts did not think she would be able to comply with taking her medications if she was released in the community without supervision, given that she was still struggling with lack of insight and she only had vague plans if released. Without her medications, she would most likely decompensate and become dangerous. Also, if she used alcohol or cocaine, this could cause impairment of judgment, lessening of impulse control, counteraction of her medication, or failure to take her medication.

On cross-examination, the People's experts acknowledged that under the standard diagnostic manual (the DSM-IV-Text-Revision), the timeframe for evaluating behaviors for remission is one year before the evaluation, and the January 2011 incidents were outside this time frame. However, they noted the incidents were nevertheless relatively recent (13 months before their February 2012 interviews and 16 months before the May 2012 trial). Dr. Carroll elaborated that the one-year remission standard was for clinical, not litigation, purposes; and in any event as a matter of common sense it was necessary to look at the "big picture" when making an assessment.

9

Testifying on her own behalf, Nelson stated that she knew she had paranoid schizophrenia, but the last time she heard voices was "[l]ast year" and she had not heard any voices "this year." She explained that her medication had been changed in 2012 and the new medication helped her a lot, worked better than her previous medication, and helped her control her anger. She also took classes that gave her tools to deal with her anger. She felt good and was not confused, and if she were released from Patton she would continue to take her medications. She no longer had problems with drugs or alcohol; had been attending AA and NA meetings; and knew she had to keep attending these meetings. If released she planned to go to Kansas City where she had family and where she would stay in an outpatient mental health facility (called "Western Missouri") until she could get her own apartment.

When asked on cross-examination about the two altercations in January and the altercation in November, at times she acknowledged she had been angry, but at other points denied that she had been angry. When denying that she had been angry, she claimed that instead she had been "agitated" and "annoyed" or "trying to get [her] point across." She recalled attacking the patients during the January incidents, but claimed she did not fight with staff when they intervened. She also testified that getting angry at these things was in the past and she had become wiser and grown up more. She acknowledged that her commitment offense (which she called "the accident") was wrong and stated she took responsibility for it, but she did not want to talk about the details. She also denied feeling angry during the commitment offense, saying that while the offense was happening she felt sad and confused, and "wanted to get away from everything."

10

In closing arguments, the deputy district attorney argued that the January and November 2011 incidents showed Nelson still had a tendency towards violence and was unable to deal with her anger even in a monitored environment; the expert testimony established that her mental illness was not in remission; and whether her new medication was working was a question for the future. The deputy district attorney stated that although the January 2011 incidents occurred slightly more than one year before the expert evaluations and trial, they were nevertheless relevant because the more recent November 2011 incident was "framed" by the January incidents and it would be irresponsible for an examining doctor not to take the January incidents into account.

Nelson's counsel argued that the People had not shown Nelson was still an MDO beyond a reasonable doubt. In support, counsel stated that a GAF score of 40 reflected some impairment but no risk of danger. Further, the only incident in the relevant one-year time frame was the November incident, during which the other patient was verbally aggressive and Nelson's conduct of grabbing the patient's shirt did not rise to the level of physical violence or a serious threat. Nelson had been generally compliant with her medications, and the symptoms that she displayed could be attributed to her conditions other than schizophrenia. Also, although the evidence showed her violence was caused by impulse control and anger problems, there was no evidence that it was caused by schizophrenic symptoms such as hearing voices or a break with reality.

The trial court stated that it agreed with Dr. Carroll that even though the DSM manual said the clinician should look to the past year when evaluating remission, the

clinician had to use common sense when making the evaluation and hence the January 2011 incidents were relevant to the evaluation.[5] Further, the court noted that during the one-year period, there was evidence that she fluctuated in her medication compliance even though she was generally compliant, and she was observed having long conversations with herself which suggested delusional behavior. The court stated that although it appeared that "things are improving[,]" it found the testimony of the two doctors to be credible and reliable; Nelson was still an MDO beyond a reasonable doubt; and her commitment should be extended for another year.

After the court made the MDO finding, Nelson's counsel requested that the court consider ordering outpatient treatment. In response to the court's query, Nelson's counsel stated he did not have any additional evidence to present on this issue. The trial court declined to order outpatient placement, stating that it was not convinced that Nelson "could be safely and effectively treated on an outpatient basis at this time."

## DISCUSSION

### I. *Sufficiency of the Evidence*

To obtain another year of involuntary treatment based on an MDO finding, the People must prove beyond a reasonable doubt that the person has (1) a severe mental disorder, (2) the disorder "is not in remission or cannot be kept in remission without treatment," and (3) "by reason of his or her severe mental disorder, the patient represents

---

5 The court explained: "So by your argument, if we were going back one year, if she had a hugely violent outburst the day before that year period, to say that we'd have to ignore that just does not make sense. So her behavior in January, even though it's technically past that year period, is certainly relevant to the evaluation."

12

a substantial danger of physical harm to others . . . ."  (Pen. Code, § 2972, subds. (a), (c).)[6]  At the annual review hearing, the People must establish that the person *currently* meets the MDO criteria.  (See *People v. Cobb* (2010) 48 Cal.4th 243, 252; *People v. Bell* (1994) 30 Cal.App.4th 1705, 1710 [MDO criteria must be shown to exist as of the date of the recommitment hearing].)

For purposes of MDO status, a severe mental disorder does not include a personality disorder, mental retardation or other developmental disabilities, or substance addiction or abuse.  (§ 2962, subd. (a)(2).)  The disorder is in remission when its overt signs and symptoms are controlled either by psychotropic medication or psychosocial support.  (§ 2962, subd. (a)(3).)  When the disorder is in remission, it is deemed to be unable to be *kept* in remission without involuntary treatment if "during the year prior to the question being before the . . . court" the person has engaged in any of the following four actions:  (1) been physically violent except in self-defense; (2) made a serious threat of substantial physical harm so as to cause a reasonable fear for safety; (3) intentionally caused property damage; or (4) failed to voluntarily follow the treatment plan.  (§ 2962, subd. (a)(3).)

Nelson contends the record does not establish that she *currently* met the MDO criteria concerning remission and dangerousness.  She also asserts that the record does not show her schizophrenia, as opposed to her other mental conditions, was the *cause* of her symptoms and behavior.

---

6      Subsequent statutory references are to the Penal Code.

In considering these contentions, we review the whole record in the light most favorable to the judgment to determine whether a rational trier of fact could find MDO status beyond a reasonable doubt. (*People v. Hannibal* (2006) 143 Cal.App.4th 1087, 1096.) We draw all reasonable inferences to support the trier of fact's findings, and defer to its credibility resolutions. (*Ibid.*)

Concerning the issue of current remission, the People's experts both opined that Nelson was still evincing symptoms of schizophrenia. Their opinions, which were credited by the trial court, are supported by the record. About nine months before trial, in an August 2011 report, Patton staff described Nelson as exhibiting symptoms indicative of schizophrenia, including having lengthy conversations with herself, displaying a flat affect, being distrustful and isolated, and engaging in disorganized behavior. About six months before trial, during the November 2011 incident, she grabbed a patient's shirt, which was symptomatic of the impulse control and anger problems she had repeatedly exhibited on previous occasions and which the doctors attributed to her mental illness. About three months before trial, during the February 2012 interviews with the People's experts she exhibited typical "negative" symptoms of schizophrenia, including flat affect, confusion, and sparse responses. During Dr. Carroll's interview, she displayed signs of listening to internal stimuli when she stared into space rather than answering his questions. This evidence supports the court's finding that her severe mental disorder was not currently in remission.

In support of her challenge to the court's no remission finding, Nelson argues that the experts agreed that during the February 2012 interviews she did not exhibit positive

14

symptoms of schizophrenia, such as delusions or hallucinations. The absence of overt positive symptoms during the interviews does not defeat the other evidence showing that her illness was not in remission, including her display of negative symptoms during the interviews; her demeanor suggestive of internal stimuli during Dr. Carroll's interview; her aggressive conduct in November 2011; and her symptomatic behavior described by Patton staff in August 2011.[7]

Nelson also argues there was insufficient evidence to establish that she was currently dangerous, as opposed to dangerous in the past. We are not persuaded. In January 2011, Nelson engaged in a high level of violence against other patients on two occasions. In November 2011, she was again involved in an altercation involving physical contact with another patient. Although the November incident did not escalate to extreme violence, it nevertheless supported that only a few months before trial she was still unable to refrain from using physical aggression when she felt angry or provoked.

The finding of current dangerousness is also supported by the doctors' assessments that she lacked insight about the connection between her mental illness and her violent behavior, and about the seriousness of her behavior and the importance of treatment. The experts' opinions on lack of insight are supported by Nelson's failure to mention her assaultive conduct when describing the commitment offense to Dr. Rice, and her attempts

---

[7] Because the record supports a finding that Nelson's schizophrenia was not currently in remission, we need not address Nelson's challenge to the alternative criteria of remission that cannot be maintained without involuntarily treatment. (See *People v. Hannibal, supra*, 143 Cal.App.4th at p. 1097.)

to minimize her anger when describing her assaultive conduct in her trial testimony. Additionally, the current dangerousness finding is supported by the doctors' concerns that she would not take her medication if released into the community given her ongoing lack of insight and her intermittent refusals in 2011 to take her medication while at Patton.

To generally undermine the evidentiary support for the court's no remission and dangerousness findings, Nelson argues that the expert's opinions on these issues were based on "stale information" because they relied on the January 2011 altercations which occurred more than one year before the February 2012 evaluations and May 2012 trial. There is no strict rule limiting the no remission and dangerousness assessments only to incidents that occurred during the preceding one-year period. Although the ultimate findings must be based on the patient's condition at the time of trial (*People v. Bell, supra*, 30 Cal.App.4th at p. 1710), past incidents may well be relevant to fully evaluate the nature of the patient's condition and potential for violence. (See *People v. Cobb, supra*, 48 Cal.4th at p. 252 ["defendant's condition a year earlier is relevant" although "not dispositive" on issues of current remission and dangerousness]; see also § 2962, subd. (f) [" '[S]ubstantial danger of physical harm' does not require proof of a recent overt act."].) The January 2011 incidents were close in time to the one-year period before the February 2012 interviews and the May 2012 trial, and the experts' consideration of the January incidents does not undermine the evidentiary support for the court's MDO finding based on the experts' opinions.

In a related argument, Nelson argues that when rendering their opinions on remission and dangerousness, the People's experts did not consider recent information

showing her medication had been changed and her behavior had improved. Although there was evidence showing Nelson's behavior had improved, the physical aggression she displayed in November 2011, coupled with the high level of violence she had displayed in January 2011, support a finding that she was still dangerous and exhibiting signs of her mental illness. The court could reasonably infer that Nelson must display a longer period of consistent nonaggression to warrant a finding that her illness was in remission and she was no longer dangerous.

Finally, Nelson argues that the record does not establish that her schizophrenia, as opposed to her other mental conditions, was the cause of her symptoms and behavior. The causative overlap between her various mental conditions does not defeat the showing that her schizophrenia was a significant factor causing her symptoms and behavior. The experts testified that although all her conditions could contribute to her symptoms and behavior, her schizophrenia was part of the cause. Given that she had been suffering from acute schizophrenia for many years, the trial court could reasonably infer that her schizophrenia was a substantial factor giving rise to her symptoms and behavior. (See *People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1321-1322 [causation defined based on substantial factor test].) The fact that her other conditions may also have contributed to her symptoms and behavior does not defeat this finding.

## II. *Outpatient Treatment*

The Penal Code contains provisions which permit certain types of mentally disordered committees to be placed in a supervised outpatient community treatment program when this placement is recommended by the inpatient treating hospital and/or by

17

the proposed outpatient community program, and then approved by the court. (§§ 1600-1604; *People v. May* (2007) 155 Cal.App.4th 350, 359-360.) Additionally, the Legislature has enacted a distinct provision (§ 2972, subd. (d)) for MDO's which authorizes the court to order outpatient placement even without the recommendation of the treating hospital and community program. (*May, supra*, at pp. 360, 363.) Under section 2972, subdivision (d), the court "has authority to release the MDO for outpatient treatment so long as it finds 'there is *reasonable cause to believe that the committed person can be safely and effectively treated on an outpatient basis*.' " (*May, supra*, at p. 359, italics added.)[8]

When requesting outpatient treatment, the MDO has the burden to show he or she is suitable for this placement. (*People v. Gregerson* (2011) 202 Cal.App.4th 306, 315-316.) To meet this burden, the MDO need not satisfy "the preponderance standard of . . . more likely than not"; rather, the statutory " 'reasonable cause' " standard merely requires "a strong suspicion in a person of ordinary prudence that outpatient treatment would be safe and effective." (*Id.* at p. 319.) Because the court is authorized to order outpatient treatment at the time of an MDO recommitment trial, the MDO may properly present evidence on the outpatient issue, including, for example, relevant testimony or

---

8       Section 2792, subdivision (d) states:  "A person shall be released on outpatient status if the committing court finds that there is reasonable cause to believe that the committed person can be safely and effectively treated on an outpatient basis.  Except as provided in this subdivision, the provisions of Title 15 (commencing with Section 1600) of Part 2, shall apply to persons placed on outpatient status pursuant to this paragraph.  The standard for revocation under Section 1609 shall be that the person cannot be safely and effectively treated on an outpatient basis."

evaluations of treatment staff and community program staff. (See *People v. May, supra*, 155 Cal.App.4th at pp. 359, 363.)[9]

Nelson asserts that we should remand this case to the trial court for a hearing on whether she could safely be placed in outpatient treatment because the trial court (1) precluded her from presenting evidence on the appropriateness of outpatient treatment, and (2) failed to apply the correct standard for the outpatient treatment issue.

In support of her contention that she was not allowed to present evidence on the outpatient issue, she cites a portion of the record where her counsel attempted to ask Dr. Rice questions about whether she could be safely released in the community if she was supervised by the outpatient community program "CONREP." The deputy district attorney objected to this evidence on relevancy grounds, arguing, among other things, that the evidence was not relevant at this phase of the trial because the suitability of CONREP was only an issue once Nelson was recertified as an MDO. The trial court sustained the objection.

At the conclusion of the trial after the court made the MDO finding, Nelson's counsel requested that the court consider ordering outpatient treatment. The court asked if this required the presentation of additional evidence. The deputy district attorney interjected that the question was whether the court finds "there is reasonable cause to

---

9       If the court grants the MDO outpatient status, it must thereafter conduct an annual review hearing, at which time the court will receive a report and recommendation from the MDO's community program director and will decide whether to renew the outpatient approval, place the MDO back in a treatment facility, or discharge the person from the MDO commitment. (§ 2972.1; *May, supra*, 155 Cal.App.4th at p. 362.)

believe that the person can safely and effectively be treated on an outpatient basis[,]" and argued this finding was not warranted due to Nelson's violence and the possibility she "could get better in the Patton setting . . . ." The court then asked Nelson's counsel if there was any additional evidence he wanted to provide on this issue, and Nelson's counsel answered, "No, Your Honor."

The court then ruled, "Without any further evidence presented to the Court on this issue, the only evidence that I have before me from the doctors' testimony is that [Nelson] represents a substantial danger to others if released. *And I am not convinced that she could be safely and effectively treated on an outpatient basis at this time*. And that's predominantly because of the concerns regarding her medication compliance as well as her history that's documented in the reports of both doctors, which include . . . this is not a recent diagnosis. This is a chronic illness that she's been suffering from. And in the past, she's had numerous psychiatric admissions, including 5150 admissions." (Italics added.)

Contrary to Nelson's assertion, the record shows that her counsel had a full opportunity to present evidence on the outpatient issue. Although the court precluded the evidence *before* it made the MDO finding, *after* it made the MDO finding it explicitly invited her counsel to present evidence on the outpatient issue. Her counsel declined to present evidence at this latter juncture, and he made no indication that he was deprived of the opportunity to present relevant evidence based on the court's earlier ruling during Dr. Rice's testimony. There was nothing inherently wrong with the court's initial ruling excluding the evidence, because if it had found she was no longer an MDO she would

20

have been discharged from her commitment and there would have been no need to consider the outpatient treatment issue. Because the court gave Nelson an opportunity to present evidence on the outpatient issue after it made the MDO finding, Nelson has not shown error based on the court's earlier evidentiary ruling.

We are also satisfied that the court applied the "reasonable cause to believe" standard when resolving the outpatient issue. This reasonable cause standard was expressly and correctly defined by the deputy district attorney just before the court made its ruling. Although the court did not explicitly reiterate the reasonable-cause-to-believe language when making its finding, absent a contrary showing in the record, we assume the court was aware of and applied the correct law. (*People v. Mack* (1986) 178 Cal.App.3d 1026, 1032.)

### DISPOSITION

The order is affirmed.


HALLER, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.